# UNITED STATES DISTRICT COURT

for the

_Western_ District of _NC_

_Charlotte_ Division

FILED
CHARLOTTE, NC

AUG 05 2025

US DISTRICT COURT
WESTERN DISTRICT OF NC

| | |
|---|---|
| _Attached_ ) ) ) ) | Case No. __3:25-CV-586-KDB__ <br> _(to be filled in by the Clerk's Office)_ |
| **Plaintiff(s)** <br> _(Write the full name of each plaintiff who is filing this complaint. If the names of all the plaintiffs cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)_ ) ) ) ) | Jury Trial: _(check one)_  ☒ Yes  ☐ No |
| -v- ) ) | |
| _Attached_ ) ) ) ) | |
| **Defendant(s)** <br> _(Write the full name of each defendant who is being sued. If the names of all the defendants cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)_ ) ) ) ) | |

## COMPLAINT FOR A CIVIL CASE

### I. The Parties to This Complaint

#### A. The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

| | |
|---|---|
| Name | _Xiaohong Sun_ |
| Street Address | _P.O. Box 33011_ |
| City and County | _Charlotte_ |
| State and Zip Code | _NC 28233_ |
| Telephone Number | |
| E-mail Address | |

#### B. The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title _(if known)_. Attach additional pages if needed.

Defendant No. 1

Name      *Toby Bryon Porter*

Job or Title *(if known)*

Street Address      *Bank of America*

City and County      *100 N. Tryon Street*

State and Zip Code      *Charlotte, NC 28255*

Telephone Number

E-mail Address *(if known)*

Defendant No. 2

Name      *Bob Goudzwaard*

Job or Title *(if known)*

Street Address      *unknown*

City and County

State and Zip Code

Telephone Number

E-mail Address *(if known)*

Defendant No. 3

Name      *Libby Kral*

Job or Title *(if known)*      *Bank of America*

Street Address      *100 N. Tryon Street*

City and County      *Charlotte, NC 28255*

State and Zip Code

Telephone Number

E-mail Address *(if known)*

Defendant No. 4 *& 5*

Name      *Theresia Moser, and Moser Law Co.*

Job or Title *(if known)*      *Moser Law Co.*

Street Address      *1028 Edgewood Ave. N.E.*

City and County      *Atlanta*

State and Zip Code      *GA 30307*

Telephone Number

E-mail Address *(if known)*

*Defendant 6....*      *John Doe 1, John Doe 2, ...*

*Bank of America*

*Tryon Street*

*Charlotte, NC 28255*

## II.    Basis for Jurisdiction

Federal courts are courts of limited jurisdiction (limited power).  Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties.  Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case.  Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation and the amount at stake is more than $75,000 is a diversity of citizenship case.  In a diversity of citizenship case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal court jurisdiction? *(check all that apply)*

[ ] Federal question          [X] Diversity of citizenship

Fill out the paragraphs in this section that apply to this case.

### A.    If the Basis for Jurisdiction Is a Federal Question

List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution that are at issue in this case.

### B.    If the Basis for Jurisdiction Is Diversity of Citizenship

1.    The Plaintiff(s)

    a.    If the plaintiff is an individual

        The plaintiff, *(name)*   Xiaohong Sun   , is a citizen of the State of *(name)*   NC   .

    b.    If the plaintiff is a corporation

        The plaintiff, *(name)* _____ , is incorporated under the laws of the State of *(name)* _____ , and has its principal place of business in the State of *(name)* _____ .

*(If more than one plaintiff is named in the complaint, attach an additional page providing the same information for each additional plaintiff.)*

2.    The Defendant(s)

    a.    If the defendant is an individual

        ~~and Moser Law Co.~~

        The defendant, *(name)*   Theresia Moser   , is a citizen of the State of *(name)*   GA   . Or is a citizen of *(foreign nation)* _____ .

b. If the defendant is a corporation

The defendant, *(name)* _Moser Law Co._ , is incorporated under

the laws of the State of *(name)* _GA_ , and has its

principal place of business in the State of *(name)* _GA_ .

Or is incorporated under the laws of *(foreign nation)* _____ ,

and has its principal place of business in *(name)* _____ .

*(If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant.)*

3. The Amount in Controversy

The amount in controversy–the amount the plaintiff claims the defendant owes or the amount at stake–is more than $75,000, not counting interest and costs of court, because *(explain)*:

_Attached in Complaint_

## III. Statement of Claim

Write a short and plain statement of the claim. Do not make legal arguments. State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought. State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

_Attached_

## IV. Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order. Do not make legal arguments. Include any basis for claiming that the wrongs alleged are continuing at the present time. Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts. Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

_Attached_

## V. Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A. For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:      _Aug 5, 2025_

Signature of Plaintiff

Printed Name of Plaintiff      _XIAO HONG SUN_

### B. For Attorneys

Date of signing:

Signature of Attorney

Printed Name of Attorney

Bar Number

Name of Law Firm

Street Address

State and Zip Code

Telephone Number

E-mail Address

FILED
CHARLOTTE, NC

AUG 0 5 2025

US DISTRICT COURT
WESTERN DISTRICT OF NC

# UNITED STATES DISTRICT COURT

for the

Western District of North Carolina

Charlotte Division

XIAOHONG SUN

              Plaintiff, Pro Se

v.

TOBY BRYAN PORTER, in his
individual capacities and his official
capacities as a principal at Bank of
America

BOB GOUDZWAARD, in his individual
capacities and his official capacities as a
managing director at Bank of America

LIBBY KRAL, in her individual capacities
and her official capacities as an employee
relations manager at Bank of America

John Doe 1, John Doe 2, …,  in their
individual capacities and official
capacities at Bank of America

THERESIA MOSER

MOSER LAW CO.

              Defendants

CASE NO. **3:25 - CV - 586 - KDB**

JURY TRIAL:  YES

# COMPLAINT FOR A CIVIL CASE

Upon information and belief, Plaintiff Xiaohong Sun complains Defendants listed and alleges the following:

## PARTIES

1.      By 2012, Plaintiff Xiaohong Sun (known as "Mary Sun") was a professional in the field of software development with over 12 years' experience working for Fortune 100 companies and five years' experience working for a top research institute. Ms. Sun was a resident of Chicago, Illinois and Charlotte, North Carolina. From August 2012 to August 2014, Ms. Sun was employed by Rose International and was contracted to work for Bank of America ("the Bank") as a Database Testing Engineer responsible for Quality Assurance and as a Data Analyst. (Quality Assurance is considered the lowest rank in the software development cycle, and the lowest rank on the team).

2.      Furthermore, with English not the native language Ms. Sun ranked top 5% on English administrated standard exam for business school entrance, with perfect quant score (year 2010), together with education courses in economics and finance (and business management) (over years since 2007, as late as 2019), exposure to multiple disciplines that the Bank actively need workers. During time period pertinent to the facts alleged in this Complaint, Ms. Sun has been actively enhancing career skills in the fields including data science and economics/finance (such as attending academic conferences in econ/finance, intensively and broadly reading academic papers) to keep up to date career skills. Ms. Sun has been actively seeking work, including positions at the Bank, also temporary work as a blue-collar labor paying less than $15/hr.

3.      Bank of America ("the Bank") is headquartered in Charlotte, Mecklenburg County, North Carolina.

4.      Defendant Toby Bryan Porter ("Porter") was, upon information and belief, a Resident of Charlotte, Mecklenburg County, North Carolina. Upon information and belief, during the time period pertinent to the facts alleged in this Complaint up to 2013, Mr. Porter was a Principal with Bank of America ("the Bank") in Charlotte, NC. Mr. Porter had supervisory authority related to Ms. Sun's work.

5.      Furthermore, upon information and belief, around 2019 Porter was promoted to an executive job title, and senior vice president. Upon information and belief, prior to that promotion, by 2023, up to now, the Bank had/has no discipline action to Porter.

6.      Defendant Bob Goudzwaard ("Goudzwaard") was, upon information and belief, a Resident of North Carolina. Upon information and belief, during the time period pertinent to the facts alleged in this Complaint up to 2017, Mr. Goudzwaard was a Managing Director with Bank of America ("the Bank") in Charlotte, NC. Mr. Goudzwaard had immediate supervisory authority over Porter. Mr. James Linnett was multiple authority levels above Goudzwaard.

7.      Furthermore, upon information and belief, around 2018 Goudzwaard was no longer with the Bank, and at certain time after 2017, James Linnett was no longer with the Bank.

8.      Asset Hedging System ("AHS") was the name of the Bank team Ms. Sun worked during 2012-2013 under Porter. By 2012 Ms. Sun starting at the AHS team, the team had about 6 team members including a team lead. By 2013 Ms. Sun ending at the team, about 4 people of the original 6 team members left and about 4 new people joined the team, with a new team lead. The reporting hierarchy was that Ms. Sun reported to team lead, who directly reported to Porter.

9.      Quantitative Risk Technology ("QRT") was the name of the Bank team Ms. Sun worked during 2013-2014, still through a (new) contract (i.e. not a Bank employee). This QRT team was under James Linnett, but has nothing to do with Porter nor Goudzwaard.

10.      Upon information and belief, Ms. Sun was hired into this new role on QRT and under a new contract was not timely known by Porter nor people directly related to Porter.

11.      Defendant Libby Kral ("Kral") was/is, upon information and belief, a fulltime permanent employee at Bank of America ("the Bank"). Upon information and belief, during the time period pertinent to the facts alleged in this Complaint for the period 2016 to 2017, Kral was an Employee Relations manager, senior vice president at the Bank, in charge of Ms. Sun's concerns.

12.      Furthermore, upon information and belief, at certain time after 2017 Kral was no longer with the Employee Relations but moved to a division under James Linnett or related to James Linnett's role, a division and work need strong background in technology that normally is hard for a worker with Kral's background to get in.

13.      Treivor Branch ("Branch") was/is, upon information and belief, a fulltime permanent employee at the Bank. Upon information and belief, during the time period pertinent to the facts alleged in this Complaint for the period around 2021 to 2022, Branch was an attorney with Employee Relations at the Bank, in charge of Ms. Sun's concerns.

14.      Brooke Bathras ("Bathras") was, upon information and belief, during the time period pertinent to the facts alleged in this Complaint for the period around 2022 and perhaps later, a senior leader at Employee Relations at the Bank. Upon information, Bathras was the contact person to Ms. Sun for that period, where Ms. Sun has never heard from Bathras nor does

Ms. Sun ever have Bathras's contact information. It was until mid of 2024 Ms. Sun first time heard of Bathras and the name.

15.     Defendant Theresia Moser ("Moser") was/is an attorney from outside of the Bank. In May 2022, Ms. Moser reached out to Ms. Sun claiming that she was retained by the Bank to conduct independent investigation on ALL concerns Ms. Sun had related to wrongs occurred at the Bank, occurred to Ms. Sun. Upon information and belief, Moser was/is licensed at state Georgia. Upon information and belief, it turns out Moser did/does not have license nor permission to practice law in North Carolina during the concerned time period.

16.     Defendant Moser Law Co. was/is, upon information and belief, a law firm located in Atlanta, Georgia, where Defendant Moser was/is a founder and an attorney.

17.     Defendants unknown identities, unknow names, John Doe 1, John Doe 2, and potential more, refer to people worked/works at the Bank who during the time period pertinent to the facts alleged in this Complaint committed to unlawful conducts.

18.     Defendants John Does labeled above, unknow identities, unknow names, might be parties already named here in this section, might be people appear in this Complaint elsewhere, might have no appearance yet in this Complaint.

19.     Collectively, "some Bank people" or "Bank people" refers to people worked, works, associated, related to the Bank, regardless of being a Bank employee or not, regardless of on this Complaint or not. When timeline matches, the phrases include Defendant Theresia Moser, and her firm Defendant Moser Law Co.

20.     Defendants, including John Does, outside of Mecklenburg County, outside of North Carolina, all satisfy the minimum contact rule with a minimum contact with the Bank, hence the Mecklenburg County, North Carolina. Plaintiff Ms. Sun is a resident of Mechlenburg County, North Carolina.

21.     This Court has jurisdiction over the parties to this action and the subject matter of this action.


## FACTUAL ALLEGATIONS (Background)


22.     The Bank had a policy on contractor workers (like Ms. Sun's roles on AHS and QRT teams) that the tenure limit for a contractor worker was 18 months. By the time Ms. Sun ended QRT contract in Aug 2014, Ms. Sun's contract was already extended to two years, beyond the Bank tenure limit of 18-month – it was said that such kind of extension was very rare or occurred only less than 1 tenth percent.

23.     Toward the end of Ms. Sun's QRT contract, there was a fulltime permanent position newly created on QRT team. Ms. Sun was the only contractor worker on QRT team during that time period, and it was said that Ms. Sun had a very good chance to be hired into that fulltime position.

24.     The Bank also had a policy about fulltime employees, regarding transferring among teams within the Bank – one needs to stay on the team for 12-18 months prior to transfer to a different team in the Bank.

25.     In 2012 coming from out of state to Charlotte, North Carolina to work at the Bank, Ms. Sun had a specific career goal, a specific niche in finance to pursue at the Bank, a goal planned to be pursued in a timely manner.

26.     By the time hired into AHS team as a contractor worker by Porter, Ms. Sun was also selected for the interview process and finished two rounds of interviews for a fulltime permanent position with a frontier team in Cloud technology, at a Global Fortune 500 company, who is still a frontier leader in the current frontier technology, such as AI. In 2012 Ms. Sun chose to work at the Bank as a contractor and let go the fulltime opportunity with the technology giant, with a hope to pursue that specific niche in finance.

27.     With such a career pursuit, also unknowing a 2013 scheme had been orchestrated on AHS team that eventually hurt Ms. Sun, her chance at the Bank, her career, her job, her basic livelihood, in 2014 when ending QRT contract Ms. Sun did not pursue the newly created fulltime position on QRT team and decided to directly apply for Bank positions that were closer to that niche in finance, a goal Ms. Sun came to Charlotte, NC to pursue.

28.     In the light of wrongs some Bank people did onto Ms. Sun and no job for more than 2 years, around 2016 or 2017 Ms. Sun had a consultation with an NC attorney, who had a highest rating of 5 on AV Peer Review Rating by Martindale Hubbell's national attorney rating process. This attorney offered to negotiate with the Bank for a six-figure settlement, but no return to the Bank. Pursuing a specific niche in finance has been a big career decision for Ms. Sun, and not returning to the Bank was not in line with Ms. Sun's career goal. Sadly, and naively, Ms. Sun could not take the attorney's offer.

29.     Similarly, around 2018 or 2019 through unofficial communications the Bank suggested to settle the situation, asking Ms. Sun to choose between a monetary settlement (an amount close to the earlier offer by one attorney) or a job at the Bank. Not requested by Ms. Sun for the settlement, nor experience on such a matter, also naively, with no hesitation Ms. Sun responded to get a job at the Bank.

30.     The dollar amount to settle cited by the attorney, by the Bank, seemed in line with a general defamation claim.

31.     Since 2014 Ms. Sun left the Bank, Ms. Sun has ended up with no formal work for over 10 years. Ms. Sun could not afford, hence stopped medical insurance around 2017, or at least more than 5 years ago. With hiring freeze everywhere during the Pandemic, even less chance for Ms. Sun to get a job but only an enlarged employment gap, leaves Ms. Sun no medical insurance for the entire several years of Covid Pandemic. Ms. Sun has been feared to death about getting Covid, living in the fear day after day, wearing mask for a much longer period of time than many people, even earlier this year (2025), and still occasionally these days. Wearing a mask also introduced other unpleasant situations that Ms. Sun has to suffer, such as being given a "the look", being joked with, being made fun of.

32.     For the entire life time, Ms. Sun does not recall a period of time with no medical insurance. For these past years, no medical insurance left Ms. Sun in a significant emotional struggle and severe emotional stress, lacking skills to handle a situation of no medical insurance. With no medical insurance, several times facing medical emergency Ms. Sun still in the debating and hard to decide whether or not to seek medical care, worrying no way to pay for the medical expenses, and compromised needed follow-up medical treatments after the initial visit. Even with some temporary hourly paid work paying in the range of $10s/hr, Ms. Sun still constantly under

stressful worry and anxiety that she could not afford getting sick to lose the piece of income from missing the work of being sick.

33. With deep poverty and financial difficulty from years of no reasonable income or no income at all, for several times Ms. Sun could not afford a food that cost just a few dollars but had to bear with the hungry. For the entire life time, Ms. Sun recalls no occasion of a hungry from lack of money to buy a food.

34. For the entire life time prior to this poverty period, Ms. Sun refused expired food, rotten food, even fast food, colorful drinks but had been selective on healthy food. For years of this poverty, Ms. Sun constantly keeps and consumes expired food, bad food, and eats a lot of sugary and oily food simply to avoid being hungry.

35. Prior to coming to Charlotte, NC working on Porter's team, for an entire life time Ms. Sun routinely go to sleep prior to 10PM, and normally had no issue in sleep, while with issues sometimes with some special situations during a life time. However, since 2012 working on AHS team, for over 10 years (except the time period on QRT team) it is hard for Ms. Sun to recall going to sleep prior to 10PM, but Ms. Sun constantly has a hard time to go to sleep, from worrying no job, no income, the basic livelihood, the constant shame, stress, anxiety, and more negative emotional states from incidents and shocks occurred at the Bank one after another one onto Ms. Sun (incidents occurred beyond 2014 ending with QRT team, details below), by defendants in this Complaint for their related conducts and respective claims.

36. Not only a determined career pursuit has been fully destroyed, no formal job no reasonable income, also Ms. Sun's health has been weakened and compromised from the emotional stress brought by wrongs some Bank people (including defendants in this Complaint) did onto Ms. Sun.

37.     In the light of wrongs some Bank people did onto Ms. Sun, which also led it hard to emotionally sustain the job interview at the Bank, fearing the interview chances, the job offers chances, being again and again unlawfully and retaliatorily taken away, Ms. Sun has been asking the Bank for a direct placement into an appropriate position at the Bank. With a naïve hope day after day to return to the Bank, Ms. Sun realized that some Bank people committed to share common goals including but not limited to refusing to acknowledge wrongs occurred, refusing to perform an effective investigation. The direct placement still has not happened.

38.     North Carolina applies 3-year limitations period for conspiracy.

39.     Defendants last act giving rise to damages sustained by Ms. Sun occurred on Aug 5, 2022 and later, when defendants produced an investigation report with gross negligence and legal malpractice to wantonly or intentionally deceive Plaintiff Ms. Sun to claim no wrongs occurred to her, and when such conspiracy still has not been withdrawn, nor any defendant affirmatively withdraws from the conspiracy.


## FACTUAL ALLEGATIONS


40.     Ms. Sun interviewed for a position within Bank of America in 2012. Bryan Porter indicated that he was interested in having Ms. Sun do work for his team at the Bank but that at that time the position he had available was a contract position.

41.     In furtherance of her longtime goal of a career in economics and finance, Ms. Sun agreed to move from Chicago, Illinois, to Charlotte, NC and to begin as a contractor to Bank of America.

42.     Ms. Sun became an employee of Rose International. Mr. Porter wrote to Ms. Sun: "The contract will be 6 month initial, with an option to renew for 2 additional 6 month terms. My expectation would be to make you a full time offer somewhere around the 12 month mark."

43.     In January 2013, Mr. Porter initiated a conversation with Ms. Sun in which he confirmed that she had done great work for the Bank and that he had gotten positive feedback about her work. He invited Ms. Sun to renew her contract.

44.     In January 2013, Ms. Sun's contract with the Bank was renewed for an additional 11 months, to end December 2013.

45.     In March or April of 2013, Ms. Sun told her team lead that she would like to transition to a different team inside the Bank. The team lead persuaded Ms. Sun to stay on the team and promised Ms. Sun an advanced position on the team. Upon information and belief, Mr. Porter was the decision-maker decided to keep Ms. Sun as part of the team.

46.     In April 2013, a replacement for Ms. Sun was hired, but he had no industry experience and no related experience. Because the replacement contractor had no experience at all, Ms. Sun trained him with regard to the job. Upon information and belief, after being trained by Ms. Sun, the replacement remained in that position for approximately two years.

47.     In 2012, before starting work, Ms. Sun had told Mr. Porter that at some point she would need to attend to a family medical matter, which would require overseas travel.

48.     Around June 2013, Ms. Sun's final project was approaching completion, and she told her team lead that at the end of the project she needed to be away from work for 6-9 weeks due to a family medical situation.

49.     On July 9 or 10, 2013, Ms. Sun met with her team lead, who informed Ms. Sun that the Bank could not keep her position open while she was away and that her contract would be ended in about two weeks.

50.     At no time prior to July 10 did anyone from Bank of America tell Ms. Sun that there were any problems with the quality of her work or her performance or that there were mistakes or fault in her work.

51.     Instead, Ms. Sun constantly got praise for her work from the management. Upon information and belief, some of the praises were directly from Mr. Porter – AHS team sat in an open area on the floor, where Porter was just about 2 or 3 seats away from the entire AHS team; also Mr. Porter was included in almost all emails the team communicated for the work. In a word, Porter knew and should know Ms. Sun's work, and praised Ms. Sun's work accordingly.

52.     During her work for Bank of America, Ms. Sun completed all of her assignments on time with top quality. As a role of quality assurance, no bug nor issue ever reported in production during Ms. Sun's tenure on Porter's team.

53.     In a July 2013 farewell email Mr. Porter wrote to Ms. Sun (see Exhibit D),

> *"Thank you for your hard work in our team. I do appreciate that. I wish you the best in finding a future position. Do stay in touch."*

54.     Upon information and belief, in September 2016, Mr. Porter communicated within Bank of America:

a.   That he had a discussion with Ms. Sun, that he had told her she was underperforming and that the primary reason for the termination of Ms. Sun's contract was her underperformance.

b.   That the team provided feedback to him that they repeatedly had to tell Ms. Sun the same thing over and over again.

c. That Ms. Sun was slow in accomplishing her work.

d. That people provided feedback that Ms. Sun was underperforming.

55. Porter made false statements to the Bank, he has never told Ms. Sun that she was underperforming. And Ms. Sun was not slow in accomplishing her work.

56. When in 2012 hiring Ms. Sun and communicating with Ms. Sun about her pay and her work, Mr. Porter wrote to Ms. Sun on July 19, 2012 that he expected the workload for Ms. Sun would give her an average 45 hours per week,

> *"I expect you to work and charge 9 hours a day, that's 45 hours a week. That isn't a strict rule, but rather an expectation. We work hard in our roles and we have to in order to meet a demanding customers' expectation. In that, typically, people are putting in a 9-10 hour day. Some days less, some more. I'm very flexible, but I just want you to understand this isn't a strictly 40 hour a week job. So, I let you charge up to 50 hours a week, but probably you will average 45. I assume 50 weeks a year, 45 hours a week."*

(EXHIBIT B)

57. As later located timesheet shows and a calculation using the timesheets shows that on average Ms. Sun reported far less than 45 hours per week, but only 40 hours per week – this is the result when taking an adverse assumption against Ms. Sun for the missed 3-week data on the timesheet and assuming a 50-hour per week for those 3 weeks. With the direct data on the timesheet, the average hours per week Ms. Sun reported is less than 40 hours/week.

58. For these averaged 40 hours/week or less, Ms. Sun successfully finished her work officially assigned to her, with a top quality, and one additional big portion of these 40 hours/week was from Ms. Sun's taking initiatives and going extra miles to help the team when the team had a management transition, and a big turn-over during Ms. Sun's 1-year short stay.

59.     Upon information and belief, Mr. Porter was in charge of approving timesheets for contractor workers on his team. Hence, Mr. Porter knew that Ms. Sun was not slow but had a great performance.

60.     There were occasions that team lead even asked Ms. Sun to slow down and to not work so much.

61.     Upon information and belief, it was per Mr. Porter's instruction that someone even asked Ms. Sun to modify her reported timesheet to report more hours so that on the record it looked consistent with the hours reported by another contractor worker on the team. Ms. Sun refused to do that.

62.     Speaking of the "discussion" Mr. Porter in 2016 mentioned to the Bank, it was Ms. Sun who in July 2013 requested a meeting with Mr. Porter to discuss the future job reference to the Bank. Ms. Sun requested such meeting after team lead informed Ms. Sun that the team could not hold the position for her being away for the family medical situation.

63.     Upon information and belief, Mr. Porter's September 2016 email to the Bank misled the audience, who did not know the truth, to interpret the situation as Mr. Porter initiated a meeting with Ms. Sun to discuss about her performance and informed Ms. Sun that she was underperforming and terminated hence, and painted that "discussion" as a seemingly performance discussion, which led to Ms. Sun's termination.

64.     In light of 2022 investigation report which states that in 2014 Porter indeed provided job reference on Ms. Sun, one reason that Mr. Porter made the 2016 false statements to the Bank is to justify his 2014 job reference, a job reference caused Ms. Sun did not get the job offer. Porter's September 2016 statements to the Bank were wanton, malice, intentionally hurt Ms. Sun and her job opportunity and reputation.

65.     Ms. Sun did not know, and had no way to know, what Mr. Porter stated in his 2014 job reference to the Bank, to the hiring team. Given Porter's 2016 false statement, the confirmation Porter in 2014 provided job reference on Ms. Sun, and the fact that Ms. Sun being the finalist (Exhibit E) and well liked but did not get the job offer, the inference is that Porter's 2014 job reference was worse or similar to 2016's so that he needed the false 2016 statements to justify that 2014's as a way to avoid being immediately investigated by the Bank.

66.     However, no ground to have a negative job reference in 2014 for Ms. Sun – for a 2-year short stay at the Bank, about a dozen Bank employees confirmed in writing to give Ms. Sun strong job reference, including multiple business users to whom Ms. Sun provided service when on Porter's team, and two (and all) team leads Ms. Sun directly reported on Porters team and these two team leads directly reported to Porter.

67.     Upon information and belief, if Porter's 2014 job reference is similar to or worse than his 2016 statements to the Bank, then that 2014 job reference was an abuse of authority, corruption, and intentional interference with Ms. Sun's employment, and intentional blacklisting Ms. Sun (N.C.G.S. 14-355), and intentional conceal and deceive certain situations back on his team during Ms. Sun's tenure of 2012-2013.

68.     Upon information and belief, Porter had situation that he needed to conceal from the Bank. Blocking Ms. Sun from returning to the Bank effectively leaves Ms. Sun's word much less weight than Ms. Sun's word would be weighted if Ms. Sun were a Bank employee. Blocking Ms. Sun from returning to the Bank satisfies Porter's personal interest.

69.     In that Porter's so-called "discussion" he in September 2016 cited to the Bank, Ms. Sun inquired Ms. Porter about job reference he would tell the Bank, Porter responded "You are not my top performer". Ms. Sun confirmed that she was a "top performer". Mr. Porter

interrupted Ms. Sun and claimed that: I did not mean you are "underperforming", but just not my "top performer".

70.     As the contract ended earlier than its term of 11-month, Ms. Sun further inquired about the termination cause, Porter responded, no reason needed to terminate a contractor.

71.     Noticing Porter did not directly address the inquiry, Ms. Sun made further Clarifications, and learned and was assured no fault on Ms. Sun's side of the termination.

72.     When the "discussion" came back to the topic about the job reference to the Bank, and Ms. Sun wondered whether Porter's "not my top performer" was a strong, neutral, or negative job reference, Porter claimed to Ms. Sun, one reason you are terminated is that you asked "repeated questions".

73.     When Ms. Sun was about to start some details of the team situation and hence her contributions, Porter warned Ms. Sun, if you continue "one word" on that direction, I will have the security escort you out NOW.

74.     It was not a situation needed a security at all. And never had been into such a situation, Ms. Sun was shocked, immediately felt an extreme shame imaging being escorted out of the Bank in front of the team and the entire open floor of people we saw every day. Ms. Sun felt strong mental distress a long time after that day, even bothered nowadays by that scene Porter created. Porter intentionally and effectively inflicted mental distress on Ms. Sun to stop her commenting on certain things. Porter's attempting calling the security when no ground to do that is a potential crime for false police report. So, this is what Porter called a "discussion".

75.     When Ms. Sun lost the 2014 job offer at the Bank due to Porter's job reference, Porter intentionally abused his authority, committed unfair and deceptive trade practice.

76.    In Nov 2014, Ms. Sun gave Porter a "head-up" of her need the job reference at the Bank. There is a chance by that time Porter already made the job reference as 2022 Moser's investigation confirmed. However, Porter did not reveal that he already did the job reference. In May 2015, Ms. Sun inquired Porter whether within past one or two months Bank managers reached out to him for the job reference. Porter did not mention that back in 2014 he already did job reference. Moser's 2022 investigation report confirmed that in 2014 Porter did provide feedback on Ms. Sun.

77.    A contractor worker did not have a performance review, nor a personal file as a record. Porter intentionally took advantage of the situation, intentionally concealed from both Ms. Sun and the Bank, and deceived both Ms. Sun and the Bank, and fooled and damaged Ms. Sun.

78.    So, the 2014 job reference was to cover up 2012-2013 team situation, and conspire to blacklist Ms. Sun and block Ms. Sun from returning to the Bank. Then 2016 defamatory statements to the Bank on Ms. Sun was to cover up that 2014 job reference on Ms. Sun, and conspire to damage, to blacklist, to tortious interference with Ms. Sun's employment at the Bank.

79.    When hiring Ms. Sun and discussing the pay, suggesting Ms. Sun to report more hours Porter in his July 20, 2012 email to Ms. Sun wrote that

*"Too high a rate gets a lot of scrutiny. More hours usually does not."*

(Exhibit C)

Ms. Sun was an hourly paid worker. Ms. Sun did not follow Porter's instruction, viewing it an attempt to fraud the Bank money. Timesheet in Exhibit H shows Ms. Sun reported much less hours than what Porter allowed her, and finished her work in much less hours than what Porter assigned her workload.

80.     However, some Bank people chose to believe Porter's defamatory words on Ms. Sun and conspired with Porter to blacklist Ms. Sun, to intentionally refuse to conduct timely and effective investigation, to conspired with gross negligence, and when the investigation eventually took place in 2022 refused to provide needed information, and left Ms. Sun continue the suffering and damages.

81.     Under such a background, upon information and belief, around 2019 defendant Porter was promoted to executive job title, senior vice president, when Ms. Sun still had no job but suffering.

82.     A few months prior to Porter's September 2016 defamatory email to the Bank, Ms. Sun in June 2016 landed a contractor job at the Bank.

83.     This happened after no job for 2 years. Meanwhile, Ms. Sun was considered for fulltime permanent jobs at the Bank, which asked Ms. Sun to provide job reference.  Ms. Sun hence reached out to Porter's immediate manager, Bob Goudzwaard, to urge Porter discuss with Ms. Sun so to reach to an agreed-on future job reference.

84.     Within 2 hours of Ms. Sun's email to Goudzwaard, Ms. Sun's contractor job offer at the Bank was retaliatorily taken back. (Exhibit F)

85.     Goudzwaard conspired with Porter, and potential other John Does, to conceal certain things on their team, conspired to retaliate Ms. Sun – legal elements of retaliation are all met in this June 2016 retaliation incident: asking to discuss Ms. Sun's performance is a reasonable and protected activity, and it is Porter's responsibility to have a correct understanding about Ms. Sun's work and hence provide a fair and truthful job reference; taking back the job offer from Ms. Sun is the adverse employment activity; the timing and the background/context of

Porter's conducts in 2013 and later his September 2016 defamatory email to the Bank connected the cause. It damaged Ms. Sun emotionally by the shock and economically by no more job.

86.     This retaliatory incident revealed a fact that Porter refused to discuss Ms. Sun's performance with her, opposite to what his September 2016 email to the Bank that he had a "discussion" with Ms. Sun on her performance. Ms. Sun indeed had a top performance that Porter had no way to directly face Ms. Sun.

87.     A few months after Porter's September 2016 defamatory email to the Bank, Libby Kral came into the picture. In December 2016, defendant Kral carried a shared common scheme with James Linnett, Goudzwaard, and Porter, applying her role as an employee relations manager to have officially blacklisted Ms. Sun, informing Ms. Sun the best "out of Bank of America". Then later Kral verbally informed Ms. Sun that she was "ineligible for rehire". Back in July 2013, in that Porter so-called "discussion", Porter voluntarily informed Ms. Sun that she was eligible for rehire.

88.     Upon information and belief, sometime after officially blacklisted Ms. Sun, Kral moved from her employee relations to a role in James Linnett's division, a role calls for a strong technology background in cyber security. It seems a return to Kral for her action to have officially blacklisted Ms. Sun.

89.     Defendants violated N.C.G.S. 14-355 blacklisting, and met all legal elements and caused damages to Ms. Sun by depriving Ms. Sun's chance of a job. Porter's September 2016 defamatory emails to the Bank on Ms. Sun was not for a job reference, was unsolicited, and it was false and negative.

90.     This December 2016 incident is also a conspiracy, 1) with more than 2 people involved to take unlawful actions against Ms. Sun, 2) with sufficient circumstantial evidence to indicate a shared common goal, an agreement to damage Ms. Sun in an unlawful way (in addition, Kral's Dec 2016 email to Ms. Sun suggested the instruction to block Ms. Sun was from James Linnett, and Kral's employee relations role was to support business (i.e. Linnett, Porter, Goudzwaard), however, Kral supported other defendants with unlawful ways, 3) caused damages to Ms. Sun (see below). Underlying tort, unlawful actions include but not limited to retaliation, blacklisting, unfair and deceptive trade practice, tortious interference with employment, intentional inflict with emotional distress, and gross negligence.

91.     The damage from "ineligible for rehire" is obvious: when Ms. Sun had no fault, simply asked for an agreed on future job reference, then the job offer was retaliatorily taken away, then an unsolicited defamatory and false email on Ms. Sun to the Bank to have it widely spread, and completely blocked Ms. Sun for all Bank opportunities. One incident (Exhibit G), on Nov 20, 2017, in the morning Bank recruiter scheduled Ms. Sun for a job interview and Ms. Sun was excited about it and immediately started preparing, then within hours in the afternoon, Ms. Sun was informed that the scheduled job interview was cancelled because Ms. Sun was ineligible for rehire, led Ms. Sun to an immediate sharp turn emotionally, into a shock and distress.  Kral also committed gross negligence. When the June 2016 retaliatory incident was just out there a few months ago, when the September 2016 defamatory emails to the Bank was just a 3-month ago, and the two reveals obvious conflicting information when Porter in fact refused to discuss with Ms. Sun on her performance, Kral's action to unlawfully blacklist was wanton, wilful, corrupt, and malice. Kral had a duty to effectively investigate the earlier wrongs in June and September 2016 so to return Ms. Sun a fair fix, Kral refused to do that, but unlawfully

blacklisted Ms. Sun, conspired with others, with "deliberate indifference" to Ms. Sun's rights, and caused damages to Ms. Sun.

92. Upon information and belief, in September 2016, Mr. Porter did not communicate with the Bank the positive aspects of Ms. Sun's work, nor did he communicate that others who reported to Mr. Porter had praised Ms. Sun's work to him.

93. Upon information and belief, the above statements have been published widely within the Bank to an unknown number of people in different departments and functionalities within the Bank.

94. Upon information and belief, the above statements made were not for a job reference, were unsolicited.

95. As a result of Mr. Porter's false and malicious statements, Ms. Sun's reputation has been damaged. In addition, upon information and belief, she has been further damaged because the Bank acted upon the false and malicious statements by relying on these statements to bar Ms. Sun from application for future employment with the Bank.

96. Upon information and belief, Mr. Porter may have made additional, similar or worse damaging statements that were hidden, inherently undiscoverable, or inherently unknowable by Ms. Sun.

97. Since learning September 2016 defamatory and false comments Porter wrote to the Bank, Ms. Sun many times asked Porter to remove it, correct it, retract it, and explained to him that Ms. Sun had a specific niche in finance she would like to pursue at the Bank. Poter refused to correct his false and damaging comments on Ms. Sun.

98.     Ms. Sun has combined skills from multiple disciplines that the Bank actively looked for candidates. Ms. Sun occasionally still got job interviews at the Bank, however, having been emotionally shocked again and again with jobs at the Bank, it became harder and harder for Ms. Sun to emotionally tolerate the interview process, with more and more anxiety and worrying that any tiny issue could lead to no interview, scheduled interview was cancelled, no job offer when a finalist, and even an earned job offer being retaliatorily taken away. Multiple occasions Ms. Sun could not emotionally endure the job interview process. One incident that the Bank knew is that, when in the holiday season of 2021 still no job, and felt hopeless to land a job for the holiday while the position interview requested Ms. Sun to conduct an assessment, Ms. Sun ran into emotional breakdown, and still tried and tried but just could not do the assessment from the fear and anxiety. Treivor Brach witnessed the incident. There were other emotional breakdowns with similar job interview situations at the Bank, such as led Ms. Sun even forgot and lost her phone. Ms. Sun already deserved and earned the job(s) at the Bank, also did well in past paper exam/assessment at the Bank, Ms. Sun deserved to be directly placed into the Bank, other than to be tortured again and again to go through the job interviews which became more and more unbearable emotionally for Ms. Sun.

99.     The conspiracy has not stopped and has not been abandoned. Even Goudzwaard is no longer with the Bank, he did not withdraw from the conspiracy, did not affirmatively take concrete action to show that he was disassociated with the conspiracy. The conspiracy continues, and new conspiracy emergers over years.

## COUNT ONE
### LIBEL (and/or Slander) *PER SE* – incident 2016

100.     Paragraphs 1 through 99 are realleged and incorporated herein by reference.

101.     As alleged above, Mr. Porter's communications included numerous false and defamatory statements of fact of and concerning Ms. Sun.

102.     The false and defamatory statements in the September 2016 communication were published to third parties.

103.     Mr. Porter's actions constitute libel (and/or slander) *per se* in that they impeach Ms. Sun in her profession.

104.     Mr. Porter knew that his accusations about Ms. Sun as described above were false or made them in reckless disregard of their truth or falsity.

105.     Mr. Porter was negligent in making the statements about Ms. Sun.

106.     Mr. Porter's false accusations about Ms. Sun described above were wilful, unjustified and malicious, and were motivated by personal hatred, spite, ill-will or common law vis-a-vis Ms. Sun.

107.     Mr. Porter's false and defamatory statements about Ms. Sun described above were made in the absence of privilege or justification.

108.     Mr. Porter did not act in good faith in making the statements about Ms. Sun.

109.     Ms. Sun multiple times asked Porter to stop and retract the defamatory statements he made in 2016. Upon information and belief, Mr. Porter refused to do it.

110.     The September 2016 communication deprived Ms. Sun of financial opportunities within the Bank and outside the Bank.

111. Mr. Porter's libelous statements about Ms. Sun have caused Ms. Sun special damages in the form of lost salary and wages, and others mentioned earlier.

112. The defendant's libelous statements about Ms. Sun have damaged Ms. Sun's reputation and have caused financial harm to Ms. Sun in an amount that exceeds $25,000.


COUNT TWO
LIBEL (and/or slander) *PER QUOD* – incident 2016

113. Paragraphs 1 through 112 are realleged and incorporated herein by reference.

114. The statements contained in the September 2016 communication are defamatory when considered in connection with innuendo, colloquium and the circumstances in which they were made, thus constituting libel (and/or slander) *per quod*.

115. Upon information and belief, Mr. Porter has, or based on Mr. Porter's statements Bank of America has, designated Ms. Sun as ineligible for rehire.

116. Upon information and belief, within the banking or finance industry, the description or characterization of the termination of a contract or employment has particular meaning.

117. Upon information and belief, Mr. Porter's description of the termination of Ms. Sun's contract has a particularly damaging meaning within the banking or finance industry.

118. Mr. Porter knew or should have known that his communication of same to others would illicit the inference from those hearing or reading same that Ms. Sun was unfit for employment or re-hiring in a banking or finance capacity

119.    The statements about Ms. Sun tend to subject Ms. Sun to ridicule, contempt or disgrace as they were understood by his subordinates, peers and superiors within the Bank and the banking community at large.

120.    Mr. Porter knew that his accusations about Ms. Sun as described above were false or made them in reckless disregard of their truth or falsity.

121.    Mr. Porter was negligent in making the statements about Ms. Sun.

122.    Mr. Porter's false accusations about Ms. Sun described above were wilful, unjustified and malicious, and were motivated by personal hatred, spite, ill-will or common law malice vis-à-vis Ms. Sun.

123.    Mr. Porter did not act in good faith in making the statements about Ms. Sun.

124.    Mr. Porter's libelous statements about Ms. Sun have caused Ms. Sun special damages in the form of lost salary and wages, and others mentioned earlier.

125.    Mr. Porter's libelous statements about Ms. Sun have damaged Ms. Sun's reputation and have caused financial harm to Ms. Sun in an amount that exceeds $25,000.

126.    Ms. Sun's 2016 defamation claims are against defendant Porter for his individual capacities and his official capacities as a principal at the Bank.

WHEREFORE, for 2016 defamation claims Plaintiff Xiaohong ("Mary") Sun prays this Court for relief as follows:

127.    That the plaintiff has and recovers of Mr. Porter damages for reputational harm in the amount of at least $25,000 and such additional amounts as the jury may award by reason of defendant's publication of statements about the plaintiff that are libelous (and slander) *per se*;

128.	That the plaintiff has and recovers of Mr. Porter damages for reputational harm in the amount of at least $ 25,000 and such additional amounts as the jury may award by reason of defendant's publication of statements about the plaintiff that are libelous (and slander) *per quod*;

129.	That the plaintiff has and recovers of Mr. Porter damages for reputational harm in the form of non-monetary relief, including public apology, retract and stop his defamatory statements on Ms. Sun, and have the Bank directly place the plaintiff into a fulltime, permanent Bank position appropriate for the plaintiff's skills and talents;

130.	That the defendant Porter's 2016 defamations are malice, wilful, and wanton, and Porter refused to retract, to stop the defamatory statements on and/or regarding the plaintiff, with aggravating factors, and the plaintiff qualifies and seeks punitive damages from 2016 defamations;

131.	Award plaintiff such other and further relief as may be deemed appropriate by the law, the court, and the jury.

COUNT THREE
BLACKLISTING – incident 2016, 2017

132.	Paragraphs 1 through 131 are realleged and incorporated herein by reference.

133.	Defendant Porter's 2016 defamatory statements blacklisted the plaintiff at the Bank, violated N.C.G.S.14-355. The plaintiff was indeed effectively blacklisted in 2017, and was also effectively blacklisted for unknown incidents even no confirmation as directly stated as in 2017, and also effectively blacklisted for future employment in the Bank and financial industry when Porter's 2016 defamatory statements on Ms. Sun and the "ineligible for rehire" status are

easily and widely available in and for the Bank with a lasting effect, and when the Bank employees, recruiters widely migrate to new employers, locally in NC or nationwide. The effect and damages to Ms. Sun are compounding and lasting.

134.    Ms. Sun's 2016 and 2017 blacklisting claims are against defendant Porter for his individual capacities and his official capacities as a principal at the Bank.

WHEREFORE, for 2016 and 2017 blacklisting claims Plaintiff prays this Court for relief as follows:

135.    That the plaintiff has and recovers of Mr. Porter damages for blacklisting harm in monetary relief, and in the form of non-monetary relief, including public apology, retract and stop his defamatory statements on Ms. Sun, and have the Bank directly place the plaintiff into a fulltime, permanent Bank position appropriate for the plaintiff's skills and talents;

136.    That the defendant Porter's 2016 defamations are malice, wilful, and wanton, and Porter refused to retract, to stop his defamatory statements on and/or regarding the plaintiff, with aggravating factors, the 2016 blacklisting are malice, wilful, and wanton, and 2017 blacklisting resulted from such aggravating factors of 2016 blacklisting, and the plaintiff qualifies and seeks punitive damages from 2016 and 2017 blacklisting;

137.    Award plaintiff such other and further relief as may be deemed appropriate by the law, the court, and the jury.


COUNT FOUR
MORE CLAIMS ON PORTER – incident 2016

138.    Paragraphs 1 through 137 are realleged and incorporated herein by reference.

139.    Ms. Sun's 2016 claims against defendant Porter further include unfair and

deceptive trade practice, tortious interference with employment, intentional inflict with emotional distress, and gross negligence as earlier explained.


WHEREFORE Plaintiff prays this Court for relief as follows:

140.    That the plaintiff has and recovers of Mr. Porter damages for mentioned harm in the amount of at least $25,000 and such additional amounts as the jury may award by reason of defendant's retaliation;

141.    That the defendant Porter mentioned actions are malice, wilful, and wanton, with aggravating factors, and the plaintiff qualifies and seeks punitive damages from mentioned claims here;

142.    Award plaintiff such other and further relief as may be deemed appropriate by the law, the court, and the jury.


## COUNT FIVE
## RETALIATION – incident 2016

143.    Paragraphs 1 through 142 are realleged and incorporated herein by reference.

144.    Ms. Sun's 2016 retaliation claims are against defendant Goudzwaard for his individual capacities and his official capacities as a managing director at the Bank.

145.    Taking away that 2016 job offer from Ms. Sun directly led to, and significantly contributed to the difficulty for Ms. Sun land another job at the Bank, and to a series later shocks and damages that defendants here and other Bank people intentionally and/or unintentionally posted onto Ms. Sun, and to the result that for over 10 years Ms. Sun had no job and terribly suffers the financial difficulty and emotional distress.

146.    This 2016 retaliation was also related to gross negligence when defendant Goudzwaard acted from wilful, wanton, and malice, and intentionally damage the plaintiff, when Goudzwaard owed plaintiff the duty to urge defendant Porter to provide plaintiff a timely, fair and truthful work evaluation, job reference but failed to do that. The retaliation was done with defendant Goudzwaard's "deliberate indifference" to plaintiff's rights, and Goudzwaard proximately caused plaintiff lost her already earned 2016 job offer at the Bank, and proximately caused plaintiff a series related emotional stress and later emotional stress during the job interviews within and/or outside of the Bank, worrying and with anxiety that all of effort plaintiff put into preparing for the job interview and even get the job offer would suddenly and with no ground get plaintiff later land nowhere.

WHEREFORE, for 2016 retaliation claims Plaintiff prays this Court for relief as follows:

147.    That the plaintiff has and recovers of Mr. Goudzwaard damages for retaliation harm in the amount of at least $25,000 and such additional amounts as the jury may award by reason of defendant's retaliation;

148.    That the defendant Goudzwaard's 2016 retaliations are malice, wilful, and wanton, with aggravating factors, and the plaintiff qualifies and seeks punitive damages from 2016 retaliations;

149.    Award plaintiff such other and further relief as may be deemed appropriate by the law, the court, and the jury.

## COUNT SIX AND SEVEN
### LIBEL (and/or Slander) *PER SE* and/or *PER QUOA* – incident 2014

150.    Paragraphs 1 through 149 are realleged and incorporated herein by reference.

151.    The statements contained in Porter's 2014 job reference is believed and inferred to be defamatory in a manner like his 2016 defamatory statements on Ms. Sun, and/or defamatory when considered in connection with innuendo, colloquium and the circumstances in which they were made, thus constituting libel (and/or slander) *per se* and/or *per quod*.

152.    Upon information and belief, also per 2022 investigation report, Mr. Porter has published the 2014 defamatory statements to the hiring managers at the Bank.

153.    Upon information and belief, within the banking or finance industry, the description or characterization of the termination of a contract or employment has particular meaning.

154.    Upon information and belief, Mr. Porter's description of the termination of Ms. Sun's contract has a particularly damaging meaning within the banking or finance industry.

155.    Mr. Porter knew or should have known that his communication of same to others would illicit the inference from those hearing or reading same that Ms. Sun was unfit for employment or re-hiring in a banking or finance capacity

156.    The statements about Ms. Sun tend to subject Ms. Sun to ridicule, contempt or disgrace as they were understood by his subordinates, peers and superiors within the Bank and the banking community at large.

157.    Mr. Porter knew that his accusations about Ms. Sun as described above were false or made them in reckless disregard of their truth or falsity.

158.    Mr. Porter was negligent in making the statements about Ms. Sun.

159.    Mr. Porter's false accusations about Ms. Sun described above were wilful, unjustified and malicious, and were motivated by personal hatred, spite, ill-will or common law malice vis-à-vis Ms. Sun.

160.    Mr. Porter did not act in good faith in making the 2014 statements about Ms. Sun.

161.    Mr. Porter's libelous statements about Ms. Sun have caused Ms. Sun special damages in the form of lost salary and wages, and others mentioned earlier.

162.    Mr. Porter's libelous statements about Ms. Sun have damaged Ms. Sun's reputation and have caused financial harm to Ms. Sun in an amount that exceeds $25,000.

WHEREFORE, Plaintiff Xiaohong ("Mary") Sun prays this Court for relief as follows:

163.    That the plaintiff has and recovers of Mr. Porter damages for reputational harm in the amount of at least $25,000 and such additional amounts as the jury may award by reason of defendant's publication of statements about the plaintiff that are libelous (and/or slander) *per se*;

164.    That the plaintiff has and recovers of Mr. Porter damages for reputational harm In the amount of at least $ 25,000 and such additional amounts as the jury may award by reason of defendant's publication of statements about the plaintiff that are libelous (and/or slander) *per quod*;

165.    That the plaintiff has and recovers of Mr. Porter damages for reputational harm in the form of non-monetary relief, including public apology, retract and stop his defamatory statements on Ms. Sun, and have the Bank directly place the plaintiff into a fulltime, permanent Bank position appropriate for the plaintiff's skills and talents;

166.    That the defendant Porter's 2014 defamations are malice, wilful, and wanton, and Porter refused to retract, to stop the defamatory statements on and/or regarding the plaintiff, with aggravating factors, and the plaintiff qualifies and seeks punitive damages from 2014 defamations;

167.    Award plaintiff such other and further relief as may be deemed appropriate by the law, the court, and the jury.


COUNT EIGHT
CONSPIRACY – 2016

168.    Paragraphs 1 through 167 are realleged and incorporated herein by reference.

169.    Ms. Sun's 2016 conspiracy claims are against defendant Kral for her individual capacities and her official capacities as an employee relations manager, SVP, at the Bank.

170.    Sharing and pursuing a common scheme with defendant Porter, defendant Goudzwaard, and party Linnett, Kral's 2016 action to officially set plaintiff ineligible for rehire was wanton, wilful, malice, and Kral (and/or other parties) intentionally, with gross negligence, damaged, blacklisted, retaliated plaintiff when Kral owed plaintiff a duty to fairly and effectively investigate wrongs occurred to plaintiff at the Bank, when plaintiff had no fault, no ground to be set for the adverse "ineligible for rehire", Kral proximately caused damages (emotionally and economically) to plaintiff from her "deliberate indifference" to plaintiff's rights.

171.    Sufficient circumstantial evidence supports that an agreement among parties to conspire in 2016 in setting Ms. Sun blacklisted, having Ms. Sun retaliated, gross negligent, and more.

172.    Kral did not stop, abandon, nor withdraw from this 2016 conspiracy, and this 2016 conspiracy continues to today, with plaintiff's situation still unfixed.

173.    This 2016 conspiracy has underling unlawful actions include but not limited to retaliations, defamations, blacklisting, gross negligence, tortious interference with employment, and conspiracy has a joint and individual liabilities.

.

WHEREFORE, for 2016 conspiracy claims Plaintiff prays this Court for relief as follows:

174.    That the plaintiff has and recovers of Ms. Kral damages for conspiracy harm in the amount of at least $25,000 and such additional amounts as the jury may award by reason of defendant's conspiracy;

175.    That the defendant Kral 2016 conspiracy are malice, wilful, and wanton, with aggravating factors, and the plaintiff qualifies and seeks punitive damages from 2016 conspiracy;

176.    Award plaintiff such other and further relief as may be deemed appropriate by the law, the court, and the jury.


COUNT NINE
GROSE NEGLIGENCE – 2022

177.    Paragraphs 1 through 176 are realleged and incorporated herein by reference.

178.    Gross negligence is defined as "wanton conduct done with conscious or reckless disregard for the rights and safety of others"

179.    Defendants conduct in the Aug 2022 investigation was willful, wanton, deceiving, intentional to hide wrongs, and done with "deliberate indifference" to Ms. Sun's rights, caused new damages to Ms. Sun, with the situation unfixed, the 2016 defamatory statements on Ms. Sun

were not stopped, was not removed, was not retracted, and the damages continue hurt Ms. Sun, and led Ms. Sun into worse emotional stress when putting up a hope for a fair and truly independent investigation.

180.    In May 2022, with no introduction by any Bank people defendant Moser reached out to Ms. Sun claiming she was from outside of the Bank, and going to do independent investigation on ALL concerns Ms. Sun had. It led hope up for Ms. Sun, mistakenly believing such an attorney would be on for both Ms. Sun and the Bank.

181.    Upon information and belief, defendant Moser was/is located in state Georgia, and was/is licensed in Georgia – per Moser Law Co. website. Moser was/is not licensed in North Carolina, neither had a permission from North Carolina to practice law in NC. After the problems in her investigation appeared, Ms. Sun many times asked Moser whether or not she was licensed or had permission to practice law in NC, no response from Moser.

182.    Per Moser's law firm website, it is a firm on employment law, while Ms. Sun's concerns went beyond employment, but also include conspiracy from the earlier time. As Moser's investigation report shows, no investigation on conspiracy. Also, upon information and belief, Moser was not familiar with defamation law, and her communication may lead defendants lose their defense on defamation claims.

183.    Moser did not follow an attorney conduct code during the investigation. For example, the first phone conversation Moser was in a public place where Ms. Sun could clearly hear the background music of a café, and servers and other customers voices.

184.    Moser did not take facts and evidence that Ms. Sun provided to her, such as she refused to recognized 2016 defamatory incidents by Porter, 2016 retaliations by Goudzwaard, 2016 blacklisting action by Kral.

185. Defendant Moser's investigation report on its own reveals many logical fallacies, and also mistakes on basic fact finding. For example, Moser's report claimed that besides the 2014 job reference, Porter has not provided any other feedback – Porter in 2016 made defamatory comments to the Bank on Plaintiff and Ms. Sun informed Moser with details on this incident prior to her ending the investigation. Another example, Moser's report claimed that no record at the Bank set Ms. Sun as "ineligible for rehire" – Ms. Sun provided solid evidence to Moser prior to her ending the investigation. Moser failed on basic fact findings, and refused to recognize information, facts, and evidences Ms. Sun's provided to her.

186. As a licensed attorney, Moser made many logical fallacies in her investigation report. For example, the report states that

> *As an initial matter, you were successful in obtaining another contractor assignment with the Bank after the assignment with Mr. Porter ended.*"

in a way to support her point that Porter's job reference had no damages on Ms. Sun – Ms. Sun's getting that 2014 contractor job when Porter was not involved. Moser intentionally, with wanton, wilful, and malic actions, ignored the tons of information and facts Ms. Sun provided to her on the details of various job situations at the Bank, as many facts presented in this Complaint.

187. Another fallacy and a common-sense mistake, Moser falsely assumes that when Porter's feedback on Ms. Sun was provided only once, hence even if damages it was limited to only that one time, one position. Moser with wanton, wilful, and malice, intentionally ignored the fact that the word spread. Even one recruiter learned the defamatory comments on Ms. Sun, the employment damages to Ms. Sun is widened to at least all positions this one recruiter had at the time period, later time period, and as this recruiter transfers to other divisions of the Bank, or even outside of the Bank, the damages to Ms. Sun's employment just follow around. And

Charlotte, NC is a small town, with all major employers, particularly employers in finance are just located with a few blocks of uptown Charlotte. The damage is not just that one 2014 job offer Ms. Sun lost from Porter's feedback on Ms. Sun.

188.    Moser's report intentionally concealed the feedback Porter made in 2014 on Ms. Sun.

189.    After getting Ms. Sun into the investigation, so that Moser could earn fees from the Bank, Moser became less and less in touch with Ms. Sun. From Moser's initial convincing Ms. Sun to join her for the investigation, and called it "independent" investigation, Ms. Sun mistakenly believed even the Bank paid Moser, it would still be a fair and thorough, and indeed "independent" investigation. It did not seem so.

190.    At certain time during her investigation, Moser claimed that the Bank no longer had emails from 2016 (hence no Porter's 2016 defamatory email to the Bank). Then Moser's communication on the retention period at the Bank became vague and contradictory, led to an unreasonable and hard to believe inference to be just or even less than a 6-month retention period at the Bank. Ms. Sun tried to communicate with Moser but still unclear.

191.    Even with no emails at the Bank, related people were still with the Bank during the investigation. It was just an easy step to inquire related people, including Porter, and Moser in her initial contact with Ms. Sun claimed that she had all information, hence all parties were in her reach, including defendant Porter, defendant Kral, and party Branch. They were all available for Moser to get needed information. However, upon information and belief Moser did not take that basic and necessary step, the report did not show the investigation on such.

192. Similar situation for Porter's 2012 emails (those in Exhibits), upon information and belief, Moser refused to take the basic step to just directly inquire Porter. And those 2012 emails were provided to Moser prior to her ending the investigation.

193. Shockingly, with a hope to expect a fair investigation, Ms. Sun was suddenly informed that the investigation was closed. Ms. Sun had been urging Moser to look into Porter's 2012 emails and his 2013 conducts, including the potential false police report that when no ground to call a security Porter warned Ms. Sun that, if you continue "one word" on that direction, I will have the security escort you out NOW, and Porter July 20, 2012 email to Ms. Sun stating that

> *"Too high a rate gets a lot of scrutiny. More hours usually does not."*

Ms. Sun still had been waiting for the update from Moser. The investigation closed.

194. So Moser and the Bank abruptly closed the investigation: When Ms. Sun inquired Moser on her verification about several crucial facts Ms. Sun presented to her, and when Ms. Sun had been waiting for her response, when the wrongdoings and the truth were just about to come out, when Ms. Sun directly and firmly pointed out to Moser crucial facts with evidence, in Aug 2022 Moser and the Bank abruptly closed the investigation, with no response to Ms. Sun's long-waited inquiries that Ms. Sun earlier multiple times made to Moser.

195. In 2024, Moser claimed to Ms. Sun that the Bank employee Brooke Bathras introduced her to Ms. Sun. Ms. Sun has never heard of, heard from Brooke Bathras, nor ever had a contact information of Brook Bathras. Hence, upon information and belief, Bathras was a party from the Bank (and/or together with other John Does) shared a common scheme with Moser, behind the scene instructed the investigation, and was one factor decided to abruptly close the investigation, from a gross negligence.

196.   It is inferred that Bathras played a role in retaining Moser, who was/is not licensed in NC, to conduct the investigation for matters mainly in NC, when Moser's report and investigation, or even integrity are concerned.

197.   Actions from John Does, and/or perhaps Bathras, are malice, wilful, wanton, in the 2022 investigation, and intentionally to hide the truth, to refuse acknowledge wrongs occurred to Ms. Sun, to refuse an effective and fair investigation. John Does, and/or perhaps Bathras, proximately caused damages (emotionally and economically) to plaintiff from their "deliberate indifference" to plaintiff's rights. And these John Does, and/or Bathras owed Ms. Sun a duty when performing an independent investigation. John Does, and/or Bathras, committed gross negligence.

198.   Defendant Moser claimed she was conducting an independent investigation. By "independent" Ms. Sun as one party that expressed concerns and has been suffering from wrongs occurred to her, deserved an impartial investigation. While Moser claimed that she was retained by the Bank, and hence a core duty to the Bank, Mose also owed Ms. Sun a duty to truthfully represent herself and the investigation, and conduct a fair, independent, impartial investigation. Moser failed on her such duties to Ms. Sun.

199.   Defendant Porter as a previous manager to Ms. Sun owed Ms. Sun a duty to fairly and truthfully report Ms. Sun's performance and all related incidents over years on the matter; defendants Kral, and parties Branch, and Bathras as the Bank people in charge of the matter over years also owed Ms. Sun a duty to timely and effectively investigate years ago, and in 2022 investigation timely to provide Moser needed information (such as past and 2016 emails, incidents facts, information, and so on), to cooperative with the investigation; and defendant Moser and her firm as a party to do the investigation, owed Ms. Sun a duty to have the

investigation performed fairly, independently, and impartially, to take necessary steps to reach

out defendants who were still at the Bank during her investigation and to make necessary steps

and inquiries. They failed their such duties – such as Moser claimed that 2016 emails were no

longer retained at the Bank, however related people, defendants and mentioned parties were still

at the Bank and with an easy reach by defendant Moser. Still, as 2022 investigation report shows,

no investigation on the 2016 retaliation, no investigation on the 2016 defamations, and Moser's

report falsely claimed that no record in the Bank set Ms. Sun as "ineligible for rehire" … to just

pointed out a few, which reflects wanton, wilful, malic, and intentional damages to Ms. Sun from

all mentioned parties.

200.    Defendants Moser and her firm Moser Law Co., and mentioned parties,

proximately caused damages (emotionally and economically) to plaintiff from their "deliberate

indifference" to plaintiff's rights, left Ms. Sun to continue suffering from the damages.

201.    When reaching out to Ms. Sun in May 2022 Moser claimed to Ms. Sun that she

would investigate all concerns Ms. Sun had. The facts from the investigation and the investigation

report indicate a NO, not that case as Moser initially claimed, promised.


WHEREFORE, for 2022 gross negligence claims Plaintiff prays this Court for relief as

follows:

202.    That the plaintiff has and recovers of related parties damages for gross negligence

in the amount of at least $25,000 and such additional amounts as the jury may award by reason

of defendants' gross negligence;

203.    That the parties gross negligence are malice, wilful, and wanton, with aggravating

factors, and the plaintiff qualifies and seeks punitive damages from 2022 gross negligence;

204.     Award plaintiff such other and further relief as may be deemed appropriate by the law, the court, and the jury.

COUNT TEN
LEGAL MALPRACTICE – 2022

205.     Paragraphs 1 through 204 are realleged and incorporated herein by reference.

206.     Per NC definition on practicing law in NC, defendants Moser and her firm's 2022 investigation on Ms. Sun's concern indeed fall into practicing law in NC.

207.     Together with earlier related allegations, Ms. Sun's 2022 legal malpractice claims are against defendants Moser and her law firm, Moser Law Co.


WHEREFORE, for 2022 legal malpractice claims Plaintiff prays this Court for relief as follows:

208.     That the plaintiff has and recovers of defendants Moser and Moser Law Co. damages for legal malpractice, in the amount of at least $25,000 and such additional amounts as the jury may award by reason of defendant's legal malpractice;

209.     That defendants' legal malpractice are malice, wilful, and wanton, with aggravating factors, and the plaintiff qualifies and seeks punitive damages from 2022 legal malpractice;

210.     Award plaintiff such other and further relief as may be deemed appropriate by the law, the court, and the jury.

## COUNT ELEVEN
## CONSPIRACY – 2022

211.    Paragraphs 1 through 211 are realleged and incorporated herein by reference.

212.    Ms. Sun's 2022 conspiracy claims are against all defendants, defendant Moser, Moser Law Co., defendant Porter in his individual and official capacities, defendant Goudzwaard in his individual and official capacities, defendant Kral in her individual and official capacities, and related unknown parties John Does in their individual and official capacities.

213.    With a shared common scheme, defendants actioned with unlawful actions including gross negligence in 2022 independent investigation, intentionally hide wrongs, intentionally refused to acknowledge wrongs to Ms. Sun, intentionally performed a subpar investigation, intentionally refused to look at the facts provided, intentionally abruptly closed the investigation when the truth and wrongs occurred to Ms. Sun was just about to come out.

214.    With all earlier alleged, there are sufficient circumstantial evidence to support 2022 conspiracy, and an agreement among parties.

215.    The underling unlawful conducts include 2022 gross negligence, 2022 legal malpractice, and continuing blacklisting Ms. Sun, and continuing defaming Ms. Sun, and the effect from the 2016 retaliation still in place. And overt act are alleged earlier.

216.    Actions of defendants in 2022 investigation are wanton, wilful, malice, and intentionally proximately damaged Ms. Sun.

217.    Many times, Ms. Sun urged Moser to acknowledge to the Bank mistakes in her investigation, and in her report. Ms. Sun heard no response from Moser.

218.    However, from time-to-time Moser just came out from nowhere behaved to Ms. Sun as if she had some authority over Ms. Sun, and led Ms. Sun in a deep wondering about who she is indeed, and her role.

219.    The conspiracy has been continuing, no party abandons, stops, nor withdraws from the 2022 conspiracy.

EXTENSION OF STATUTE OF LIMITATION

220.    Paragraphs 1 through 219 are realleged and incorporated herein by reference.

221.    Pursuit to "continuing wrongs" doctrine, statute of limitation starts from 2014, or 2016 are tolled.

222.    Given the 2016 conspiracy started in June 2016, with underling unlawful retaliation, and later unlawful defamations, unlawful blacklisting, and other torts, has not been abandoned, the statute of limitation tolls back to June 2016.

223.    Given above materials and further explanation below, Ms. Sun respectfully asks the Court to consider exceptions and consider allowing extension for Statute of Limitation for defamation (all forms) claims to recognize 2016 defamatory incident, or even 2014 defamatory incident.

224.    The 2016 defamatory incident is one crucial piece for the 2022 conspiracy in Moser's investigation, when one shared common goal of defendants was to wantonly, intentionally hide the 2016 unlawful action of defamation and refuse to acknowledge wrongs so to deceive Ms. Sun and to not fix the situation, but to continue damages to Ms. Sun. In addition, in the light of Moser's 2022 investigation when it confirms that Porter indeed in 2014 offered job

reference on Ms. Sun when Ms. Sun was the finalist on a Bank fulltime and permanent position however Ms. Sun did not get the 2014 job offer, it is believed that the 2016 defamatory statements is a way that Porter deceived the falsity of 2014 job reference (Ms. Sun did/does not know and has no way to know what Porter in 2014 stated on or about her --- discovery rule would allow an extension for 2014 statements when it is discovered, and at that time Ms. Sun was a resident in IL, which has the discovery rule on defamation claims). Chaining further back, it is implied that the 2014 job reference is damaging and is believed to cover up even earlier wrongs in 2012-2013 on AHS team. So 2016 defamatory incident is one crucial piece for 2022 conspiracy, and a crucial piece for a series conspiracy since even earlier years.

225.    Ms. Sun did not know what comments defendant Porter made on Ms. Sun. Ms. Sun was a finalist on the Bank position, then after the job reference by Porter Ms. Sun did not get the job, and the job was again posted to start the search from the beginning.

226.    In Nov 2014 Ms. Sun gave defendant Porter a "heads-up" about the interview process and that a job reference might be needed from him. By that time there was a chance that defendant Porter already shared the job reference. However, Poter did not confirm it but responded on Nov 14, 2014 "Thanks for the heads up. Hope you are doing well." Then in May 2015 Ms. Sun inquired Porter whether in the past one or two months or so he was contacted for a job reference, Porter had no intention to confess that he already gave a job reference in 2014, and his response on May 14, 2014 was "No, I don't recall anyone contacting me. Hope you are going well." Defendant Porter's such actions prevented Ms. Sun to timely learn the 2014 defamatory incident.

227. Even 2022 "independent investigation" by Moser does not reveal to Ms. Sun the content of the 2014 job reference but only confirmed that Porter in 2014 did provide the job reference. And Moser's investigation and report attempted to deceive Plaintiff to even made effort to hide the 2016 defamation incident. Defendants' action prevented Ms. Sun to timely learn the 2014 defamatory incident. Ms. Sun respectfully asks this Court applies the discovery rule to allow extension for 2014 defamatory incident.

228. In 2014 the time of the publication of 2014 job reference, the 2016 defamatory incident, and in the 2022 Moser's investigation report to confirm the 2014 job reference, Ms. Sun was also a resident in Illinois which recognizes the discovery rule to extend the defamation claims.

229. The publications of 2014 and 2016 defamatory statements on Ms. Sun by Porter were not made in a good faith, but to hide earlier wrongs.

230. Coming from Asian culture that promotes harmony and avoids conflict, and views the legal suit a shame and failure regardless of one being a plaintiff or a defendant, Ms. Sun has been facing an extreme obstacle to take the step for the lawsuit, to go public and expose to the public how badly she had been bullied and fooled around. It brings a feeling of extreme shame. Imagining a lawsuit filed, Ms. Sun felt hard to even get out of the door.

231. With English not a native language for Ms. Sun, reading and understanding legal materials is extremely challenging. Even with an attorney, and Ms. Sun did look for and speak with attorneys, it is still challenging to indeed understand the full scope of the lawsuit and its potential negative impact on one's life.

232. This led to even so hard for Ms. Sun to look for an attorney. Such as a defendant side does not take a case for plaintiff side, and with Bank of America involved, most firms do not even speak with Ms. Sun due to conflict of interests. This process to look for an attorney itself already felt like hopeless. In the beginning stage to look for an attorney, Ms. Sun did not even know there is a difference between state law and federal law and attorney's practice is limited with such scope. On reading a profile of a DC attorney whose experience seemed a good match for Ms. Sun's situation, Ms. Sun took a trip to DC to do the consultation, only found out the attorney practice only in DC and learned that Ms. Sun needed to find an NC attorney.

233. Yes, now Ms. Sun learned to read the attorney's profile on the website to see where they are licensed. However, when years earlier such information available on the website and was in front of Ms. Sun, and English words are known to Ms. Sun, it just did not click the sense. Lawsuit goes beyond English vocabulary, but a sense and familiarity to the law.

234. Also, filing a defamation case means one has to self-disclose those defamatory Statements, which posts additional stress.

235. For defamation case attorneys do not do contingency. Even if Ms. Sun was determined to have her innocence returned, allocated money for the lawsuit even considered liquidating all savings to do it, there is a chance of short of money and the case fails in the middle. By 2017, Ms. Sun has been out of a formal job for 3 years.

236. Such extreme emotional stress is additional for Ms. Sun after having experienced accumulated stress since 2014 left the Bank, and ran into again and again shocks from unlawful actions by some Bank people. It has been just too much for Ms. Sun to carry, to do a lawsuit.

237. In 2017, Ms. Sun indeed came so close to file the lawsuit – Ms. Sun took trip to Raleigh to work in person with the attorney (a tier 1 ranked defamation attorney with AV 5 rating), and had the legal Complaint written and ready to file … it had been the statute of limitation deadline pushing Ms. Sun move along the process. So, when the Complaint was ready, and the last day to file was here, all left for Ms. Sun was the decision to file or not to file. To gain more time into deciding on that we had a legal courier travel to the Mecklenburg County court house and to wait there for Ms. Sun's decision. That whole afternoon on Sep 6, 2017, Ms. Sun sat on the ground of a facility in Raleigh crying and crying, for hours, could not take that final step to file the case. As the 5PM came, what Ms. Sun could do was to just no action. Ms. Sun believes that witnesses could be located according to the time and location to testify the emotional struggle Ms. Sun faced in that afternoon.

238. In a word, either financially or emotionally, by 2017 statute of limitation Ms. Sun was not capable, was not ready to do the case.

239. Besides emotionally and financially unready, by 2017 Ms. Sun has been out of work for 3 years, making a living was urgent. So not so many people have the luxury to pursue a defamation case to fix the reputation. It has been a painful result in 2017 for Ms. Sun to pass the statute of limitation and to not sue.

240. In addition, the timesheet (Exhibit H) was not available by 2017, but only many years later Ms. Sun accidentally acquired it. The timesheet is solid evidence to prove the falsity of 2016 defamatory statements Porter made.

241. The poverty and the struggling for the poverty, and no hope to get a formal fulltime job forced Ms. Sun to file the case now and hope the law is still available for the justice.

242.   This filing is also under a significant emotional stress and Ms. Sun was not ready any day earlier. It is the exact 3-year deadline considering the 2022 investigation report dated Aug 5, 2022.

243.   In 2015 Porter had an email to Ms. Sun stating to Ms. Sun "You are a nice person." Yes, Ms. Sun has been considering for others: helped AHS team when the team was in the need of help from Ms. Sun while Ms. Sun faced a family medical situation overseas and needed to timely take the trip; considering many Bank people's interest even including Porter's best interest and giving them an understanding when Ms. Sun faced the need to file the lawsuit.   Porter calculatedly chose Ms. Sun the victim to take advantage of. Being a nice person should not be the ground for Porter to take advantage of Ms. Sun as he did in this Complaint.

244.   With such said, Ms. Sun respectfully asks this court allow exceptions of statute of limitation to 2014 and 2016 defamation incidents, and allow extensions on statute of limitation to those claims.


This date of Aug 5, 2025.


Respectfully submitted,

Xiaohong Sun

/s/ Xiaohong Sun

P.O. Box 33011
Charlotte, NC 28233